DISCIPLINARY COUNSEL *v.* JOHNSON.

[Cite as *Disciplinary Counsel v. Johnson,*
113 Ohio St.3d 344, 2007-Ohio-2074.]

(No. 2006–1197—Submitted November 14, 2006—Decided May 16, 2007.)

## Per Curiam.

{¶ 1} On December 6, 2004, relator, Disciplinary Counsel, charged respondent, Bryan Bright Johnson of Columbus, Ohio, Attorney Registration No. 0003981, with professional misconduct in violation of the Code of Professional Responsibility. A panel of the Board of Commissioners on Grievances and Discipline heard the cause during October and November 2005, after preliminary proceedings, including the denial of respondent's motion to dismiss the complaint for prejudicial delay. The panel made findings of fact, conclusions of law, and a recommendation, all of which the board adopted.

{¶ 2} Relator's complaint alleged numerous violations of the Disciplinary Rules, but the panel unanimously dismissed most of the charges for insufficient support pursuant to Gov.Bar R. V(6)(H). Of the remaining allegations, Counts I, III, and IV each charged respondent with violations of DR 1–102(A)(6) (prohibiting conduct that adversely reflects on an attorney's fitness to practice law) and 2–106(A) (prohibiting a lawyer from charging or collecting an illegal or clearly excessive fee). Counts I, III, and IV all questioned the propriety of legal fees that respondent assessed while acting as Helen Bryan's attorney-in-fact and guardian and as guardian of Bryan's sister, Lucille Lauder.

{¶ 3} Count I accused respondent, a member of the Ohio bar since 1983, of continuing to perform legal work to collect money that had been stolen from Bryan and Lauder by their former attorney, despite the unlikelihood that he would recover enough of the funds to justify his fees in pursuing them. Count III alleged that respondent had padded bills for his work with unnecessary and repetitive tasks for the 2½ years he represented the sisters. Count IV charged that respondent had improperly sought to have his fees paid from a $100,000 award from the Client Security Fund. The board found that respondent had violated DR 1–102(A)(6) and 2–106(A) as to each of these counts and recommended that respondent be publicly reprimanded.

### I. Facts Precipitating the Board's Findings of Misconduct

### A. Bryan Hires Respondent

{¶ 4} During the events at issue, Bryan and Lauder lived in a nursing home. In April 1998, a social worker at the facility contacted respondent about representing the interests of the two elderly women who were at that time in dire financial trouble and in danger of being turned out of the home. Bryan's and

Lauder's financial distress developed after Karen Suzanne Bond, a lawyer to whom Bryan had previously granted power of attorney, misappropriated over $800,000 of their combined assets.[1]

{¶ 5} On April 14, 1998, respondent met with Bryan, who was anxious about her and her sister's financial situation. Bryan was competent at the time, although she had been experiencing short-term memory loss, but Lauder was mentally incompetent. Respondent brought with him a durable general power of attorney, which Bryan signed, appointing respondent as her attorney-in-fact. Respondent filed the power of attorney in Franklin County Probate Court. Later that April, the probate court appointed respondent to be Lauder's guardian, and on July 7, 1998, respondent filed an inventory listing $1,993 in assets for the guardianship estate.

{¶ 6} In investigating Bond's misdeeds and attempting to recoup the sisters' misappropriated assets, respondent filed civil concealment actions against Bond, her husband, her children, and her parents. He determined that roughly 80 percent of the missing assets belonged to Bryan. Thus, when respondent collected money, he typically placed 20 percent of the proceeds into the Lauder guardianship estate and the other 80 percent into a bank account that he had established pursuant to the Bryan power of attorney. Respondent had to report disbursements from the guardianship to the probate court; he did not have to report disbursements he made pursuant to the power of attorney from the Bryan bank account.

### B. Respondent Recovers Funds, from which He Pays Bryan's and Lauder's Expenses, Including His Fees

{¶ 7} In the summer of 1998, respondent's recovery efforts resulted in Bond's transferring her real estate and surrendering four motor vehicles to Bryan and Lauder. Respondent sold the real estate for $135,000 and divided the $115,999.40 in net proceeds between the sisters. For devoting 25½ hours at $150 per hour to the land-sale action, which he had had to pursue in order to sell Lauder's interest in the property, respondent paid himself $3,825 from the sale proceeds. He also separately billed the sisters for his work in relation to this sale, claiming that he had provided extra services that were not customarily involved in a land sale.

{¶ 8} Respondent first applied on October 29, 1998, for his fees and costs in the Lauder guardianship. The probate court approved the application, which listed respondent's legal services from April 13 through June 10, 1998, for $9,818.75 in fees and $1,296.54 in expenses. Respondent's billing records show that on

---

1. Bond resigned from the practice of law in Ohio with discipline pending on May 6, 1999. *In re Resignation of Bond* (1999), 85 Ohio St.3d 1222, 709 N.E.2d 1208.

October 29, 1998, he also billed Bryan $9,536.75 for his services from April 13 through June 10, 1998, as Bryan's attorney-in-fact, plus $1,609.67 in related expenses.

{¶ 9} In December 1998, respondent filed a malpractice action against Bond that the court later consolidated with Bond's insurer's declaratory-judgment action. Respondent established Bond's malpractice, but her insurer succeeded in showing that Bond had stolen assets intentionally and that the policy did not cover theft. Lauder and Bryan thus recovered nothing from the malpractice action.

{¶ 10} Respondent's law clerk had warned him as early as November 1998 that the malpractice claim had little chance of success, and in January 1999, another attorney whom respondent consulted agreed with that conclusion. Notwithstanding this advice, respondent continued to bill for his services in pursuit of malpractice-insurance proceeds through May 2000. At the panel hearing, respondent claimed that he had been acting in accordance with Bryan's wishes.

{¶ 11} On February 26, 1999, respondent filed a second application for fees and costs in the Lauder guardianship. The probate court approved the application, which listed respondent's legal services from June 11 through November 24, 1998, for $17,435.75 in fees and $48.14 in expenses. Respondent's billing records reflect that on March 1, 1999, he billed Bryan $24,261.75 for serving as her attorney-in-fact from June 11, 1998, to February 25, 1999, plus $84.20 in related expenses.

{¶ 12} In May 1999, respondent applied to become Bryan's guardian, citing her mental incompetence. The probate court granted his application on June 10, 1999. Respondent reported $38,000 in assets on the guardianship application and also reported that he controlled these funds pursuant to a durable power of attorney. In the inventory he filed for the guardianship estate, however, respondent listed Bryan's assets as only $1,000. In place of full disclosure, respondent wrote on the inventory that Bryan had other assets in accounts outside the guardianship estate.

{¶ 13} Respondent's failure to include all of Bryan's assets reduced the bond that he was required to post to protect the Bryan guardianship. His failure to list all of Bryan's assets in the guardianship also concealed from the probate court the disbursements of Bryan's assets to respondent for his continuing to serve as Bryan's attorney-in-fact.

{¶ 14} Respondent's billing records indicate that he billed Bryan $19,780.50 on June 30, 1999, for serving as her attorney-in-fact from December 1, 1998, to June 29, 1999, plus $379.71 in related expenses. His billing records also reflect that on October 31, 1999, he billed Bryan $5,590 for serving as her attorney-in-fact from June 21 to September 7, 1999, plus $108.43 in related expenses. His billing

records further show that on January 31, 2000, he billed Bryan $1,697 for serving as her attorney-in-fact from September 8 to October 1, 1999. None of these disbursements were submitted to the probate court for review.

{¶ 15} Respondent filed a third application for fees and costs in the Lauder guardianship on April 27, 2000. The probate court approved the application, which listed respondent's legal services from November 25 to December 30, 1998, for $1,495 and $625.63 in expenses. The probate court also approved a fourth application dated June 29, 2000, which listed respondent's legal services in the Lauder guardianship from January 1 until February 4, 1999, for $2,818.

{¶ 16} During the ten months from April 1998 to February 1999, respondent received $33,537.81 in fees and costs for his work for the Lauder guardianship. During the 18 months from April 1998 through September 1999, respondent approved payments to himself through the Bryan power of attorney for $63,048.01 in additional legal fees and costs from Bryan. These amounts plus the $3,825 fee respondent took for his work in the land-sale action show that respondent had by this time charged Lauder and Bryan $100,410.82.

C.   The Probate Court Intervenes

{¶ 17} In October 2000, respondent submitted a fifth application for fees and costs in the Lauder guardianship seeking $23,071.50 for his services from February 5, 1999, until September 11, 2000. Two magistrates referred the application to Franklin County Probate Court Judge Lawrence Belskis for review. Judge Belskis, who would later discover that respondent had been receiving fees and expenses through the Bryan power of attorney in addition to his fees for the Lauder guardianship, demanded that respondent produce all his billing records for Bryan and Lauder.

{¶ 18} On November 2, 2000, respondent gave copies of his records to Judge Belskis, including an updated fifth application for fees and costs in the Lauder guardianship and a first application for fees and costs in the Bryan guardianship. Judge Belskis caused both applications to be formally filed on December 29, 2000. For his services as Lauder's guardian from February 5, 1999, to September 11, 2000, respondent sought $42,307.50 in fees and $55.39 in costs. For his services as Bryan's guardian from October 4, 1999, through September 7, 2000, respondent sought $16,571.50 in fees and $107.74 in costs. Due to the probate court's intervention, respondent never collected these charges.

{¶ 19} The two new applications brought the total of fees and expenses that respondent tried to charge Bryan and Lauder to $159,452.95. During that same period, he recovered $197,683.45 of their $800,000 in misappropriated assets. At some point in December 2000, the Client Security Fund also awarded $50,000 each to Bryan and Lauder, for a total of $100,000.

{¶ 20} On December 20, 2000, respondent resigned as guardian for Lauder and Bryan rather than risk removal by the court. In February 2001, respondent filed final accounts for both guardianship estates and for acting as Bryan's attorney-in-fact. Attorney Lloyd E. Fisher, whom Judge Belskis appointed to succeed respondent as guardian for the sisters, filed exceptions to the accounts, charging that respondent's fees were excessive.

{¶ 21} In October 2001, Judge Belskis found that respondent had charged excessive fees and had breached his fiduciary duties to Bryan and Lauder. Judge Belskis found that respondent was entitled to a fee of $40,000 and ordered respondent to disgorge all fees that he had collected exceeding that amount, which meant disgorging at least $50,000. On appeal, the Franklin County Court of Appeals reversed the judgment and remanded the cause, holding that Judge Belskis had denied respondent due process of law by committing procedural errors that denied him a fair trial. *In re Guardianship of Lauder*, 150 Ohio App.3d 277, 2002-Ohio-6102, 780 N.E.2d 1025.

{¶ 22} On June 24, 2003, Visiting Judge Thomas E. Louden signed an agreed-judgment entry allowing respondent to keep $90,742.50 in fees and $4,152 in expenses for which he had already been paid. The parties agreed in the entry that the fee was consistent with the standards for assessing reasonableness and necessity in R.C. 2109.32 and applicable Disciplinary Rules and local probate-court rules. The entry also noted that "there are insufficient funds to pay any further fees," meaning that the assets of Bryan and Lauder had been completely depleted. Respondent withdrew his applications for $59,042.13 in fees and costs.

## II. The Board's Rationale for the Findings of Misconduct and the Recommended Sanction

### A. Misconduct

{¶ 23} The board found that respondent had violated DR 1–102(A)(6) and 2–106(A) as charged in Counts I, III, and IV. As to Count I, the board found that respondent had violated these rules by pursuing legal claims beyond the economic feasibility of recovering for his clients' benefit. As to Count III, the board found, in effect, that respondent had violated these rules by overworking in each case beyond what was reasonable and necessary to protect his clients' interests. As to Count IV, the board found violations of these rules based on respondent's admission that he had charged for his help in securing money from the Client Security Fund, in violation of Gov.Bar R. VIII(6)(B) (prohibiting payment of attorney fees from awarded proceeds unless granted by the Board of Commissioners of the Clients' Security Fund). The board explained:

{¶ 24} "Respondent's defense was an explanation in minute detail of all of his actions that justified a fee [and expenses] of [approximately] $94,000 * * * for

recovery of approximately $190,000 in assets and more than 1200 hours of legal services billed at tenth of an hour increments. Finally, respondent asserts that because of the wording in certain judgment entries issued [referring to probate court entries ordering respondent to pursue legal action to recoup the assets embezzled from his clients], respondent had complied with all ethical directives, his expenses were reasonable, proper and necessary, and his actions were with court approval.

{¶ 25} "Respondent recovered a substantial amount of assets for the wards. He found the means to keep them in the nursing home where they desired to be and provided comfort and security to both of them. Most of the services provided may have been proper and, perhaps, necessary. Respondent's billing statements claim more than 1200 hours of legal services including services for the Lauder guardianship, Bryan power of attorney, Bryan guardianship, concealment action against Bond, land sale procedure, unsuccessful malpractice suit against Bond and her insurer and a concealment action against Bond's children and parents."

{¶ 26} The board nevertheless found that respondent's "attorney fees were in excess of what was reasonable and well beyond what any competent client would knowingly consent to based on the expected outcome." Respondent recovered the most significant assets, over $165,000, in the first six months of representation in the Lauder and Bryan concealment actions and billed around $46,000 for his services. During the remaining 25 months, however, respondent recovered only around $21,000 and yet billed over $100,000 in fees. In all, he billed $159,452.95 to collect 197,683.45.

{¶ 27} The board further observed:

{¶ 28} "Respondent admitted that he might have included charges for time preparing applications to the Client Security Fund. He admits that this was improper."

B. Sanction

{¶ 29} In recommending a sanction for this misconduct, the board weighed the aggravating and mitigating factors in respondent's case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 30} As aggravating factors, the board found that respondent had acted with a selfish motive, engaged in a pattern of misconduct, and committed multiple offenses. See BCGD Proc.Reg. 10(B)(1)(b), (c), and (d). Respondent also refused to acknowledge the extent of his wrongdoing, which far exceeded the minor billing errors and Client Security Fund charges he admitted. See BCGD Proc.Reg. 10(B)(1)(g). Moreover, because respondent's wards were both elderly

and mentally incompetent and had already suffered greatly from the actions of a lawyer they had trusted, the board found that respondent had harmed vulnerable victims. See BCGD Proc.Reg. 10(B)(1)(h).

{¶ 31} The board also identified several mitigating factors, including that respondent had no prior disciplinary record and had openly and cooperatively participated in the disciplinary proceedings. BCGD Proc.Reg. 10(B)(2)(a) and (d). Respondent further established his good reputation and character apart from the underlying misconduct. He submitted many letters from attorneys extolling his integrity and competence as an attorney and confirming that he is an active member in many professional organizations and is a lecturer for both the Ohio State and the Columbus Bar Associations. BCGD Proc.Reg. 10(B)(2)(e).

{¶ 32} Relator advocated that respondent be suspended for one year and, consistent with the fees that Judge Belskis approved, that he be ordered to pay $50,000 in restitution. Respondent urged dismissal of the complaint, or alternatively, a public reprimand. The board recommended a public reprimand, finding respondent's billing practices on a par with the irregularities for which we publicly reprimanded lawyers in *Disciplinary Counsel v. Fish* (1999), 85 Ohio St.3d 168, 707 N.E.2d 851, and *Columbus Bar Assn. v. Mills,* 109 Ohio St.3d 245, 2006-Ohio-2290, 846 N.E.2d 1253.

### III. Review

{¶ 33} Both parties object to the board's findings of misconduct and recommended sanction.

{¶ 34} In his first objection, respondent argues that his fees were not excessive. He alternatively argues in his second objection that the clients had received substantial benefit from his work, that he has no prior record of misconduct, and that the personal and professional price he has already paid completely offset any slight excess in fees. In his third objection, respondent argues that relator delayed unreasonably in completing the disciplinary investigation and thereby compromised his defense. Respondent urges dismissal of the complaint.

{¶ 35} Relator objects to the recommended public reprimand, arguing that aggravating factors and precedent support an actual suspension of respondent's license. Relator next argues for $50,000 in restitution. In the third objection, relator urges us to find a violation of DR 1–102(A)(4) (prohibiting a lawyer from engaging in conduct involving fraud, deceit, dishonesty or misrepresentation) in addition to DR 1–102(A)(6) and 2–106(A). Relator advocates a one-year suspension.

{¶ 36} We find, primarily on the strength of relator's expert testimony, that respondent charged and collected clearly excessive fees in the Bryan and Lauder matters and thereby violated DR 1–102(A)(6) and 2–106. We further find no

prejudice attributable to relator's delay in bringing the charges and that the panel's unanimous dismissal of the charged DR 1–102(A)(4) violations ended inquiry into those claims. Finally, for the public's protection and to deter the use of billing practices that so obviously violate the reasonable-fee standard set forth in DR 2–106(A), we hold that a one-year suspension, with six months stayed, and $50,000 in restitution is the appropriate sanction.

A. Clearly Excessive Fees

{¶ 37} To find a fee clearly excessive under DR 2–106(A), we must be convinced that "after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." DR 2–106(B). The following DR 2–106(B) factors guide us in applying this standard:

{¶ 38} "(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

{¶ 39} "(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

{¶ 40} "(3) The fee customarily charged in the locality for similar legal services.

{¶ 41} "(4) The amount involved and the results obtained.

{¶ 42} "(5) The time limitations imposed by the client or by the circumstances.

{¶ 43} "(6) The nature and length of the professional relationship with the client.

{¶ 44} "(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

{¶ 45} "(8) Whether the fee is fixed or contingent."

{¶ 46} Relator has satisfied DR 2–106(A) with clear and convincing proof. Michael Murman, an attorney since 1975 whom the parties stipulated to be an expert in probate practice, testified at length as to the application of the DR 2–106(B) guidelines to respondent's conduct regarding the Lauder and Bryan guardianships and the power of attorney for Bryan. Murman has extensive experience in every legal aspect underlying this case, and after a comprehensive review of respondent's billing records, respondent's deposition, and the deposition of respondent's probate-practice expert, he testified as to his "definite and firm" conviction that the fees were excessive overall.

{¶ 47} As a seasoned practitioner, Murman saw nothing particularly complicated or contested about the guardianships or power of attorney. He dismissed as exaggerated respondent's claims that the work required exhaustive hours and extensive expertise. Murman questioned respondent's failure to evaluate the cost to Bryan and Lauder for continuing to pursue a claim with little chance of

recovery. That respondent failed to place all of Bryan's assets under probate-court supervision upon setting up her guardianship also disturbed Murman, and respondent's subtle disclosure on the inventory did little to mollify his suspicions.

{¶ 48} Asked about respondent's serving first as attorney-in-fact for Bryan and guardian for Lauder and, little more than one year later, as Bryan's guardian, Murman testified:

{¶ 49} "[H]e was appointed [Lauder's] guardian, and then he proceeded to do the normal things that one would expect on behalf of these women who had been exploited by [their former] attorney, except that he came in periodically with applications for fees and had those fees approved for these tasks on behalf of the guardianship. And then unbeknownst to the court or without any proper disclosure of what he was doing to anybody, he paid himself using the power of attorney from the funds that belonged to * * * the woman who had not been clearly incompetent at the time that he first met her.

{¶ 50} "And so in effect every time he was coming in for his fees, he was in fact receiving two to three times as much money as it appeared that he was receiving when the court saw only the one application. And he wasn't answering to anybody except, according to his testimony, he did notify this woman who had been completely victimized by another attorney, and evidence that I had was that she was, if not mentally impaired, she was certainly highly vulnerable and susceptible to the influence of attorneys and could hardly be considered to give informed consent."

{¶ 51} Asked about the reasonableness of respondent's bills for over $159,000, Murman testified:

{¶ 52} "The accomplishments that he had which were substantial and to be expected [from] an experienced probate lawyer were virtually complete at a time when by his own billing he should have been paid somewhere in the neighborhood of $40– or $50,000, as I recall.

{¶ 53} "And he just kept on billing and billing and billing long after they had pretty well exhausted the * * * reasonable activities on behalf of this guardianship until he had enough billed time to absorb the $100,000 that was coming in from the Client Security Fund."

{¶ 54} In support of his opinion that the fees actually paid respondent, which came to at least $94,894, were also excessive, Murman testified:

{¶ 55} "[V]irtually all but about 20,000 of [the roughly $197,000 that respondent recovered from pursuing the assets of Bond and her family] was recovered even before, by his own accounting, he had gone beyond about 50–60,000, something like that, in fees. * * *

{¶ 56} "Most of the excess that I see occurred after he got all but that last 20,000. And so I think that you can only charge so much even when you – you can work very, very hard and lots and lots of hours, but if you're not accomplishing anything, you can't reasonably expect to be paid for it, particularly when you're working as a fiduciary. You're the guardian. You're not dealing with somebody at arm's length * * *."

{¶ 57} Murman continued:

{¶ 58} "The fees that he applied for and the fees that he received were both excessive given the results obtained and the nature of the work. This is not that hard, this work that he was doing. [Bond] had already * * * been indicted by the federal government.

{¶ 59} "[Bond] had a duty to [disgorge] herself of all of her assets. She had a huge incentive, a much greater incentive than anything [respondent] could ever do to her, and that was she wanted to reduce her prison time. * * * [U]nder the guidelines she had to prove to the adult probation department of the federal court that she had made every bit of restitution she possibly could.

{¶ 60} " * * * [H]is job was to get the judgment which he got against her real early and real easy, because she didn't resist it, she couldn't, and then to wait, and eventually the funds would be turned over to him. Then he had some work to do.

{¶ 61} "He had to liquidate things such as the house. * * * But it was not that difficult. This is not super sophisticated work. It does not require a great deal of legal effort. And so that's [why] I've got a big complaint with running up the fees of that magnitude * * *.

{¶ 62} " * * * [The Bryan and Lauder matters involved] definitely more than you would have in a traditional, normal, easy guardianship for sure, but what happened here is just so out of proportion to what was necessary or reasonable that I am firmly convinced that it was a grievously excessive fee."

{¶ 63} Murman acknowledged respondent's obligation to file both the concealment and malpractice actions against Bond promptly to avoid applicable statutes of limitation. Within a relatively short time, however, respondent had received a judgment establishing that Bond had intentionally embezzled from Lauder and Bryan, and, Murman observed, he must have realized that Bond intended to plead guilty to federal theft charges. Respondent nevertheless ignored what Murman called "Insurance Law 101"—the rule that "an insurance company does not have the duty of indemnification for [an insured's] illegal act," the very principle that led to the declaratory judgment in favor of Bond's malpractice insurer. Murman testified:

{¶ 64} "[H]e kept that lawsuit alive and kept churning the file creating events * * * to achieve billable hours on something that * * * no rational, competent, ethical lawyer would allow his client to do—He just went on and on and on, billing long after * * * there was nothing to be accomplished with the malpractice case, or no realistic potential of collecting anything."

{¶ 65} Murman also acknowledged that respondent might have offered, with the probate court's approval, to pursue such an uncertain cause of action on a contingent-fee basis. Murman said that that would have been an acceptable arrangement because by accepting a percentage of funds collected, instead of billing by the hour, respondent would bear most of the risk of nonrecovery. In contrast:

{¶ 66} "[F]or [respondent] to do it on [Bryan's] money I think is completely unreasonable. And if he were advising [Bryan] as her outside counsel, and her malpractice counsel was suggesting that she do this, he'd tell her no. And * * * these women had no protection because [respondent] was the guy that should have been saying no to himself, the attorney that was plowing ahead on this unreasonable litigation.

{¶ 67} "That's my opinion. And I believe that if he would have gone to court or gone to any outside source, nobody would have given him the green light to proceed at [Bryan's] expense."

{¶ 68} Murman also questioned respondent's billing practices with regard to the land-sale action because, in his experience, lawyers are customarily paid from the sale proceeds or through a fee request in the guardianship, but not both. Murman further found questionable many of respondent's hundreds of billing entries, and noted his serious concern over entries for preparing or reviewing a "memo," in which the "memo" was written on a post-it note. But these irregularities, some of which Murman conceded respondent might be able to explain, were not Murman's greatest concern. To Murman, respondent's billing his clients an hourly rate to pursue the malpractice lawsuit against Bond's malpractice insurer when there was no reasonable hope of recovery was respondent's biggest ethical violation.

{¶ 69} In conclusion, Murman clarified that he had not based his opinion on the individual cost of each task that respondent or his staff performed in the course of representing Bryan and Lauder, and that his opinion was not a product of mathematical certainty. He had instead found respondent's billing practices excessive "based on the totality * * * of the billing and the activity that is represented by the billing." Murman explained:

{¶ 70} "The amounts sought and the amounts received were clearly excessive for the activities and tasks that were completed, and the value of those to [Bryan and Lauder]. That's what my opinion is based on. It's not based on any

particular inventory, any particular practice, save one. There is one that, if anything, it reinforces particularly my opinion that this is excessive, and that is the manner in which he handled that power of attorney."

{¶ 71} We find Murman's testimony persuasive. His remarks underscore a fundamental tenet: attorney fees are not justified merely because the lawyer has charged his professional time and expenses at reasonable rates; a legitimate purpose must also explain why the lawyer spent that time and incurred those costs. Here, however, respondent admitted that he did not even consider a cost-benefit analysis. We therefore have no doubt that respondent continued to aggressively pursue any legal claim on Bryan's and Lauder's behalf to the point where his fees consumed most of the recovered assets and, if his final bills had been paid, would have consumed a substantial portion of the awards from the Client Security Fund.

{¶ 72} In finding respondent's fees excessive, we reject his argument that he was obligated by order of the probate court to continue pursuing the claims he did for as long as he did. As relator points out, the probate court issued these orders, most of which were in agreed-judgment entries submitted by respondent and Bond's counsel, because respondent advocated these pursuits. Thus, his reliance on the orders hardly exonerates him.

{¶ 73} Nor must respondent's fees be found reasonable based on the agreed-judgment entry signed by both respondent and Fisher and filed in the probate court. Respondent urges us to defer to the entry and find that respondent's fees complied with the reasonableness standards, but such a finding simply does not comport with the facts in this case. Moreover, we are convinced by the final acknowledgement in the entry—"there are insufficient funds to pay any further fees"—and Fisher's testimony in this case, that Fisher had simply determined that any further efforts on his part to recover the fees from respondent would be futile because the cost of his efforts would use up any money recovered.

{¶ 74} Finally, respondent's excessive fees cannot be excused through the claim that he was acting in accordance with Bryan's wishes. Though respondent now characterizes Bryan as having been of merely diminished mental capacity, she was mentally incompetent at least as of the June 1999 guardianship order. Even before the guardianship, Bryan and her incompetent sister had had over $800,000 stolen by Bryan's previous lawyer, which, as Murman observed, showed Bryan's susceptibility to a lawyer's influence. The sisters' situation thus cried out for respondent to scrupulously follow fiduciary standards of care. Respondent's representation fell far short.

{¶ 75} Respondent's first and second objections are therefore overruled.

B.   No Prejudice Caused by Relator's Delay

{¶ 76} Respondent also asks us to dismiss relator's complaint, asserting that unreasonable delay in relator's investigation prejudiced his defense and violated his right to a fair disciplinary hearing.   He cites Gov.Bar R. V(4)(D)(2), which sets forth the normal time limits for disciplinary investigations and provides that "[n]o investigation shall be extended beyond one year from the date of the filing of the grievance."   Respondent also relies on section (D)(3) of the rule, which provides that "[i]nvestigations that extend beyond one year from the date of filing are prima facie evidence of unreasonable delay."

{¶ 77} The parties do not dispute that relator opened the investigation in this case in December 2001 and closed it in December 2002, pending respondent's appeal of Judge Belskis's order denying him all but $40,000 in fees.   And respondent does not dispute that relator admonished him that the investigation might be reopened depending on the disposition of the appeal.   On September 22, 2004, relator reopened the investigation and sent a letter notifying respondent of the intent to formally file the instant complaint.

{¶ 78} Relator insists that the investigation was completed in a timely manner, but we need not decide this question.   Under Gov.Bar R. V(4)(D)(3), none of the time limits set forth in the rule are jurisdictional, and the rule requires prejudice in addition to unreasonable delay for dismissal.   We see no prejudice to respondent's defense.

{¶ 79} The incidents underlying relator's complaint ended nearly four years before the panel hearing, and respondent complains that witnesses have died, memories have faded, and evidence has grown stale.   It is true that Bryan and Lauder are both deceased, but neither would have been competent to testify had they still been living.   Respondent's co-counsel in the Bryan and Lauder cases also died before the hearing, but his testimony would merely have corroborated that respondent actually did all the work reflected in his billing records, a fact that is not in dispute.   Moreover, respondent's meticulous and comprehensive billing records are at the heart of this case;   all were available for review, and respondent testified about them with no significant memory lapse.   Thus, respondent's third objection is also overruled.

C.   Review of the Dismissed DR 1–102(A)(4) Charge

{¶ 80} Under Gov.Bar R. V(6)(H), "[i]f * * * a unanimous hearing panel finds that the evidence is insufficient to support a charge or count of misconduct, the panel may order that the complaint or count be dismissed."   Relator urges us to also find violations of DR 1–102(A)(4), notwithstanding that the hearing panel unanimously dismissed those charges pursuant to this rule.   As we said in

*Cuyahoga Cty. Bar Assn. v. Marosan,* 109 Ohio St.3d 439, 2006-Ohio-2816, 848 N.E.2d 837, ¶ 13, however, "[w]e do not review such dismissals."

{¶ 81} Relator nevertheless argues that Gov.Bar R. V(6)(H) allows the panel to dismiss only a count of misconduct or the entire complaint, not individual violations. We reject this hypertechnical reading of the rule. The authority to find insufficient support for a charged violation of a Disciplinary Rule and to dismiss the count containing the charge necessarily brings with it the authority to dismiss the charged violation itself. Relator's third objection is therefore over-ruled.

### D. The Appropriate Sanction

{¶ 82} In recommending a public reprimand, the board relied on *Disciplinary Counsel v. Fish,* 85 Ohio St.3d 168, 707 N.E.2d 851, and *Columbus Bar Assn. v. Mills,* 109 Ohio St.3d 245, 2006-Ohio-2290, 846 N.E.2d 1253. Relator claims that neither case involved the excesses and aggravating factors that are present here. We agree, inasmuch as those lawyers did not overcharge incompetent clients, nor did they purposely avoid review of their fees by a court.

{¶ 83} As we have often explained:

{¶ 84} " '[I]n determining the appropriate length of the suspension and any attendant conditions, we must recognize that the primary purpose of disciplinary sanctions is not to punish the offender, but to protect the public.' *Disciplinary Counsel v. O'Neill,* 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53; see, also, *Ohio State Bar Assn. v. Weaver* (1975), 41 Ohio St.2d 97, 100, 70 O.O.2d 175, 322 N.E.2d 665. As we stated in *Weaver,* ' "In [a] disciplinary matter, the primary purpose is not to punish an offender; it is to protect the public against members of the bar who are unworthy of the trust and confidence essential to the relationship of attorney and client; it is to ascertain whether the conduct of the attorney involved has demonstrated his unfitness to practice law, and if so to deprive him of his previously acquired privilege to serve as an officer of the court." ' Id., quoting *In re Pennica* (1962), 36 N.J. 401, 418–419, 177 A.2d 721." *Disciplinary Counsel v. Agopian,* 112 Ohio St.3d 103, 2006-Ohio-6510, 858 N.E.2d 368, ¶ 10.

{¶ 85} The lawyer in *Agopian* submitted fee requests for representing indigent defendants that contained careless timekeeping mistakes, but he did not attempt to trick the court into paying for work he had not performed. In publicly reprimanding that lawyer, we contrasted his comparatively benign inaccuracies with lawyer billing practices that exploit procedures for paying court-appointed lawyers. Because deliberate efforts to deceive obviously represent a far greater evil, we distinguished such exploitive practices as warranting an actual suspension from the practice of law.

{¶ 86} Thus, in *Disciplinary Counsel v. Holland*, 106 Ohio St.3d 372, 2005-Ohio-5322, 835 N.E.2d 361, we suspended a court-appointed lawyer's license for one year because he took advantage of a juvenile court's fee-payment process by charging in separate fee requests for more hours than he possibly could have worked. The respondent attorney, an experienced and respected practitioner, argued that the court had condoned his billing practices by paying the requested fees, but we held that the lawyer was responsible for the excess fees that he had claimed. We observed:

{¶ 87} "By overcharging the juvenile court, respondent exploited an already overburdened system designed to aid the poorest members of our society and lessened public confidence in the legal profession and compromised its integrity. In light of the serious harm caused to the taxpaying public, the judicial system, and the legal profession, an actual suspension of respondent's license is required." Id. at ¶ 22.

{¶ 88} We find the *Holland* sanction instructive in this case, including the restitution that we ordered as a condition for that lawyer's reinstatement. In exploiting his incompetent wards and the probate court's process for approving fees, respondent similarly lessened public confidence in the legal profession and compromised its integrity. These improprieties also warrant a one-year suspension for the public's protection and to deter future misconduct.

{¶ 89} We therefore sustain relator's first objection and suspend respondent from the practice of law in Ohio for one year; however, we stay the last six months of the suspension, and to ensure that respondent returns to the ethical practice of law, we order that respondent serve a six-month probation period. During the probation period, in addition to the requirements of Gov.Bar R. V(9), respondent shall advise any probate court in which he practices that he has been disciplined for excessive fee applications. If respondent fails to comply with this condition, the stay shall be lifted, and respondent shall serve the entire one-year suspension. Moreover, as a condition of reinstatement, respondent must show that he has paid $50,000 in restitution to the probate court for disbursement as assets of Bryan and Lauder.

{¶ 90} Costs taxed to respondent.

Judgment accordingly.

MOYER, C.J., CALABRESE, PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

ANTHONY O. CALABRESE JR., J., of the Eighth Appellate District, was assigned to sit for RESNICK, J., whose term ended on January 1, 2007.

CUPP, J., whose term began on January 2, 2007, did not participate in the consideration or decision of this case.

Jonathan E. Coughlan, Disciplinary Counsel, and Robert R. Berger, Assistant Disciplinary Counsel, for relator.

Benson A. Wolman, for respondent.