DISCIPLINARY COUNSEL *v.* SUMMERS.

**[Cite as *Disciplinary Counsel v. Summers,***

**131 Ohio St.3d 467, 2012-Ohio-1144.]**

*Attorneys—Misconduct—Multiple violations of Rules of Professional Conduct,*
*including charging or collecting an illegal or clearly excessive fee and*
*failing to promptly refund any unearned fee upon the lawyer's withdrawal*
*from employment—Six-month suspension and $15,000 restitution.*

(No. 2011-0464—Submitted September 7, 2011—Decided March 22, 2012.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and
Discipline of the Supreme Court, No. 10-037.

_____

**Per Curiam.**

{¶ 1} Respondent, William Lawrence Summers of Cleveland, Ohio,
Attorney Registration No. 0013007, was admitted to the practice of law in Ohio in
1969 and is also licensed to practice in Kentucky.

{¶ 2} On April 12, 2010, relator, disciplinary counsel, charged Summers
with several violations of the Rules of Professional Conduct arising from his
representation of a client who had been charged with multiple felony offenses. A
panel of the Board of Commissioners on Grievances and Discipline conducted a
hearing and issued a report, finding that Summers had (1) charged a clearly
excessive fee, (2) failed to advise his client in writing that if he failed to complete
the representation, the client might be entitled to a refund of all or part of the fee,
(3) failed to promptly refund the unearned portion of his fee at the time of his
withdrawal from the representation, and (4) engaged in conduct that adversely
reflects upon his fitness to practice law. The panel recommended that Summers
be suspended from the practice of law for six months and that the issue of

restitution be resolved in fee arbitration or other court proceedings. The board adopted the panel's findings of fact and misconduct and its recommended sanction but also recommends that Summers be required to refund the full $15,000 fee to his client.

{¶ 3} Summers objects to the board's findings of fact and misconduct and argues that the recommended sanction and restitution are excessive and punitive. We overrule Summers's objections to the board's findings of fact and misconduct and overrule his objection with regard to the recommended sanction.

**Misconduct**

{¶ 4} The panel and board found that the client, Anthony Bell, was 19 years old when he was charged with multiple felony offenses for allegedly assaulting a police officer during a brawl in the stands at a professional baseball game between the Cleveland Indians and New York Yankees. Anthony, a resident of upstate New York who had no criminal record, insisted he was innocent; he maintains that position today.

{¶ 5} Anthony and his family knew no one in Cleveland. Acting on the referral of a bondsman, and with his family's financial support, Anthony retained Summers to defend him. From the beginning of the representation, Anthony and his family never equivocated in expressing what they wanted from Summers: exoneration of the charges.

{¶ 6} Summers's first fee agreement with the Bell family was executed around the time of Anthony's arraignment in late April 2008. At the initial meeting, Summers secured an advance of $1,000 for expenses and a retainer of $2,500 from the family. And "to do a favor for them, to be kind to them," Summers agreed to reduce his hourly charge from $350 per hour to $250 per hour. Nonetheless, when Anthony's family received Summers's first invoice shortly after July 1, 2008, they discovered that Summers had charged them $350 per hour, the initial $2,500 retainer had been exhausted, they owed Summers an

additional $2,500, and they were being charged for work performed by Summers's associate, Aaron Baker, at the rate of $125 per hour.

{¶ 7} Baker evidently had worked for Summers for years but had only been licensed to practice law for several months when Summers assigned him to this case. Summers avers that Baker's time was normally billed at $175 per hour but that Summers had also reduced Baker's rate for this case.

{¶ 8} Upon the Bells' inquiry, Baker acknowledged the $100 per hour billing discrepancy and assured them that the bill would be corrected. Rather than adjust the bill himself, Baker asked Anthony's mother to pay the corrected amount. The Bell family never received an invoice with the correct billing rate and did not pay the erroneous invoice. Summers continued to represent Anthony for the next two months without a word about the nonpayment.

{¶ 9} Less than one week before a pretrial hearing set for September 9, 2008, however, Summers informed Anthony that he was in breach of the fee agreement and threatened to withdraw from his representation unless a new fee agreement was secured. In doing so, Summers did not focus on the billing issue or nonpayment of fees as a reason for the alleged breach. Rather, Summers chastised Anthony's parents for their "interference" with his representation and stated that "there was something standing in the way of him completing the case."[1]

{¶ 10} Anthony testified that he was scared out of his mind by Summers's threat to withdraw. His parents were worried about retaining new counsel; they did not think that they could afford to pay new counsel in addition to paying

---

1. At the time, Summers was in conflict with a private investigator he had retained to assist in Anthony's case. He believed that the investigator had performed unauthorized work in the case, made derogatory or negative statements to the Bells about him, and tried to refer Anthony and his parents to another attorney to represent them in the case.

Summers's fee. The Bells therefore agreed to a new fee agreement—a flat-fee arrangement—with Summers.

{¶ 11} The flat-fee agreement specified that Anthony and his family would pay $15,000 to Summers "in addition to any and all amounts already paid."[2] The agreement provided that $15,000 was all that Anthony would owe, regardless of the time that Summers would spend on his behalf, including work through the investigation "and, if necessary, through the trial, and if necessary, sentencing, or other disposition of the case."

{¶ 12} In the fee agreement, Summers characterized the $15,000 fee as nonrefundable and, despite the requirements of Prof.Cond.R. 1.5(d)(3), did not advise the client and his family that they might be entitled to a refund of all or part of the fee if he failed to complete representation. In fact, although Summers initially insisted that he had read each word of the retainer to Anthony and his parents and explained each paragraph to them, he later admitted that he had not read to them the paragraph about the fee not being refundable. And when Anthony's mother subsequently sent an e-mail to Summers asking reasonable questions about the flat-fee retainer and what it meant, Summers responded with an e-mail that was, at best, impatient and intemperate, and at worst, scathing. In that e-mail, he also stated that the $15,000 flat fee "will cover all of the Attorney fees for the matter to the end, regardless of what time we have to spend which is <u>a benefit to you</u>. If you discharge us, you will however owe us for all of our time spent thus far, less the initial retainer. You will also owe us for bringing the new Lawyer up to speed." (Underlining sic.)

{¶ 13} Four months after extracting the flat-fee agreement, Summers's representation abruptly ended. After collecting $17,726.01 in fees, Summers

---

2. When the Bells questioned the initial bill sent by Summers, Baker's response stated, "Our retainer on a case like this would typically be $15,000. Because of your circumstances, we agreed to a heavily reduced retainer of $2,500, and agreed to bill you for our time as we went along. This arrangement was based upon anticipated prompt payment."

called Anthony in December and told him that "things weren't looking good, and he was going to try to work out a plea." The following month, Summers screamed at Anthony's father that he was "done" and "finished." After nine months of representing Anthony, Summers refused to continue the representation and then moved to withdraw, without securing a plea agreement for his client or otherwise finishing representation.

{¶ 14} The board found by clear and convincing evidence that Summers violated Prof.Cond.R. 1.5(d)(3) (prohibiting a lawyer from charging a flat fee without simultaneously advising the client in writing that the client may be entitled to a refund of all or part of the fee if the lawyer does not complete the representation). We expressly reject Summers's protestations that his failure to include the language was an honest mistake that arose from his use of a form document intended for use in Kentucky, where, he argues, such notification is not required.

{¶ 15} The board also found that Summers violated Prof.Cond.R. 1.5(a) (prohibiting a lawyer from making an agreement for, charging, or collecting an illegal or clearly excessive fee), 1.16(e) (requiring a lawyer to promptly refund any unearned fee upon the lawyer's withdrawal from employment), and 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law). The board challenged Summers's claim, and the testimony of two experienced criminal-defense attorneys, that he was entitled to the entire $15,000 fee based upon the hours he had spent on the case multiplied by his then hourly rate of $400. Prof.Cond.R. 1.5(a) lists a number of factors that must be considered in determining whether a fee is reasonable.[3] In determining

---

3. {¶ a} Factors to be considered under Prof.Cond.R. 1.5(a) include:
   {¶ b} (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
   {¶ c} (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

that the fee was clearly excessive, the board noted that Summers had not interviewed any witnesses, the prosecutor had yet to turn over his responses to a discovery request, no motions to suppress had been filed, no trial date had been set, and Summers had failed to complete the representation that he had agreed to see through to trial or sentencing. Moreover, the board found that Summers had fabricated reasons for withdrawing from representing Anthony, claiming that he and his parents were difficult to work with and had unrealistic expectations about his prospects for exoneration, as well as accusing them of attempting to suborn perjury.

{¶ 16} Summers objects to the board's findings of fact and misconduct, arguing that the method he used to calculate his fee was appropriate, that relator could not prove that his fee was clearly excessive in the absence of expert testimony, that he substantially complied with the requirements of Prof.Cond.R. 1.5(d)(3) by providing an itemized bill to justify his retention of the entire flat fee, and that because there is insufficient evidence to prove that his fee is clearly excessive, there is also insufficient evidence to support a finding that he violated Prof.Cond.R. 8.4(h).

{¶ 17} Having carefully reviewed the record, we conclude that these objections are without merit. Although the time spent and the experience, reputation, and ability of the lawyer providing the services are factors to be considered in determining whether a fee is reasonable, they are not the only factors relevant to that determination. Indeed, the rule identifies both the results

---

{¶ d} (3) the fee customarily charged in the locality for similar legal services;

{¶ e} (4) the amount involved and the results obtained;

{¶ f} (5) the time limitations imposed by the client or by the circumstances;

{¶ g} (6) the nature and length of the professional relationship with the client;

{¶ h} (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

{¶ i} (8) whether the fee is fixed or contingent.

obtained and the nature of the fee, be it fixed or contingent, as relevant considerations. Prof.Cond.R. 1.5(a)(4) and (8).

{¶ 18} When a lawyer agrees to represent a client through the conclusion of the case for a flat fee, and that lawyer withdraws from representation without cause before the work is completed, he cannot retain the entire flat fee by resorting to a mathematical calculation of his billable hours. To hold otherwise would leave clients at the mercy of lawyers who charge significant flat fees to provide complete representation only to withdraw when the demands of the case become too onerous. While we recognize that Summers is entitled to be compensated for the services he has provided, the Bells are also entitled to receive a benefit for their flat-fee bargain.

{¶ 19} Notwithstanding Summers's insistence that he kept "copious" billing records, his invoices to the Bells had numerous errors, and his billing was excessive for the amount of work completed. And he violated Ohio law with an illegal nonrefundable flat-fee agreement.

{¶ 20} And as the board concluded, "Respondent took great pains during the hearing to portray the Bells as difficult people whose conduct made continued involvement with them impossible. However, the panel simply does not believe Respondent's allegations and concludes that his complaints regarding the Bells' conduct are nothing more than a fabrication designed to convince the panel that he had an acceptable basis for his eventual discharge of the Bells as clients." Summers asserted several reasons for withdrawing.

{¶ 21} First, he claimed that his investigator had taken the Bells to see another lawyer "to try and get him to take over the case."

{¶ 22} Second, Summers asserted that there were "several instances of situations where [the Bells] were just incredibly unreasonable. And they started to have times where they were not telling the truth, so it was a whole package that already started in August * * *." But when asked, under oath, what the Bells had

lied about, Summers responded, "I don't remember." Summers did complain that Anthony had lied about his cell phone not working.

{¶ 23} Third, Summers claimed that he would answer Anthony's questions about his defense only to be subsequently questioned by his parents about what he had said to Anthony. He intimated that the Bells were interfering with his representation by second-guessing his decision making. The record does not support those contentions.

{¶ 24} The Bells, who wanted their "son to have the best counsel possible" in a serious criminal case in which he faced incarceration, admit that initially they asked many questions of Summers in an effort to understand what was happening. But after receiving the first invoice that showed minimum quarter-hour billing for responding to even brief e-mails, the Bells insist that they ceased almost all communication with Summers. As Mrs. Bell testified, when the family saw the charges they were incurring for communications, "pretty much all communications stopped from there. We barely talked."

{¶ 25} Even after executing the flat-fee agreement, the Bells had nothing but incidental communication with Summers and "no meaningful discussions, communications, [or] correspondence of any kind."

{¶ 26} Anthony observed that Summers "did not take kindly to a simple question" from his mother, and thereafter Anthony asked few questions himself. He knew that it "became very expensive to communicate with [Summers], especially through e-mails." And Anthony was afraid to even take the time to read the flat-fee agreement because "we didn't want to take too much of his time, to save money."

{¶ 27} Mrs. Bell also testified about Summers's demeanor, describing how he "blew up" and exploded when she asked about the efforts to secure a video and video expert and how her husband was subjected to a "one-sided screaming fiasco by Mr. Summers" when Summers called to announce he was

8

done with the case. That call reduced her husband to tears and forced him to plead with Summers, "Don't do this to my son. Please don't do this. I'm begging of you, don't do this." As Mrs. Bell said, "[W]e were treated * * * like low life."

{¶ 28} The fact that the Bell family asked questions of Summers did not make them obstructionist, difficult, or contemptuous. Moreover, Summers knew, or should have known, that the Bells would ask questions of him. Summers met the Bell family at the outset of representation and included them as signatories in the retainer. He knew that this family was committed to obtaining justice for their son but were inexperienced with the legal system. Indeed, he promised them that their calls would be returned promptly, and he had no trouble depositing the checks they wrote to him for thousands of dollars in fees, even while he complained that they were "interfering" with the representation that those checks paid for by simply asking questions about the progress (or lack thereof) in the defense of their son.

{¶ 29} Finally, Summers suggested that his withdrawal was necessary because of the Bells' unethical conduct in asking him "to commit perjury on the stand." The specific context of that claim is not clear given the cryptic testimony Summers provided on that point, but Summers intimated that the Bells had identified a witness who would testify falsely about the incident at the ball game in an effort to exonerate Anthony. The Bells, however, denied any knowledge of that witness.

{¶ 30} The board's finding that Summers's contentions had no merit is amply supported by the record. Summers failed to establish that the Bells interfered with his representation or that the Bells monopolized his time with questions, acted dishonestly, or otherwise acted inappropriately. Certainly, there is no support in this record for the scandalous claim that the Bells were suborning perjury. The board found that Summers terminated representation of Bell "without justifiable cause."

**{¶ 31}** The affronts to the Bells and the profession did not stop with Summers's withdrawal from representation. After withdrawing, Summers submitted a final invoice to Anthony and his family. That invoice showed that an additional $2,586.49 was due. Billing records support the board's conclusion that Baker, not Summers, did much of the work on this case. And Summers had the temerity not only to charge Anthony and his family $1,425 for preparing the motion to withdraw as Anthony's counsel, but to then charge them for Summers's work on *his* (Summers's) complaint to a state agency claiming that the private investigator he hired had acted unethically in her relationship with the Bells.

**{¶ 32}** Having carefully considered the record before us, we conclude that Summers's objections are without merit and therefore adopt the findings of fact and misconduct of the board.

### Sanction

**{¶ 33}** When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli,* 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in BCGD Proc.Reg. 10(B). *Disciplinary Counsel v. Broeren,* 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21.

**{¶ 34}** As aggravating factors, the board found that Summers acted with a dishonest and selfish motive, cooperated only grudgingly in the disciplinary process with an air of righteous indignation, was evasive and lied during his testimony at the panel hearing, refused to acknowledge the wrongful nature of his conduct, harmed vulnerable clients, and failed to make restitution. *See* BCGD Proc.Reg. 10(B)(1)(b), (e), (f), (g), (h), and (i). Mitigating factors found by the board include Summers's 41 years of practice without prior discipline and his good character and reputation apart from the underlying disciplinary offense, as

demonstrated by approximately 50 letters from attorneys, judges, family members, and others.

{¶ 35} Citing Summers's conduct toward the Bells and his attitude throughout the disciplinary proceedings, the panel recommended that Summers serve an actual six-month suspension from the practice of law and that the issue of restitution be left to a fee arbitration or court proceeding initiated by the Bells. The board agreed that Summers should be suspended for six months but recommends that he be required to return the entire $15,000 fee to the Bells.

{¶ 36} Summers objects to the recommended sanction, arguing that it is excessive and punitive in light of relator's failure to submit any expert testimony or other evidence to establish a reasonable fee for the services he provided and the mitigating factors in this case.

{¶ 37} To be sure, the record here is replete with letters from judges, lawyers,[4] and family members who have experienced positive interactions with Summers and who cite the contributions Summers has made to the bar and community and discuss his good reputation.

{¶ 38} Here, there is no dispute that Summers has been highly successful around the state and the country in defending those charged with sensational and news-garnering crimes, and in what Summers boasts as "high profile, high-line cases." There is no suggestion that he has not served all of those clients quite well. But this case is about the services he rendered in a far less public case, with a far less public client.

{¶ 39} As Summers knew, Anthony suffered from a social-anxiety disorder, and he and his family were very troubled by the charges against him, which carried with them the specter of imprisonment. Neither he nor his family

---

4. One of the character letters was written by an attorney whom this court has publicly reprimanded for improper billing practices. *Disciplinary Counsel v. Agopian*, 112 Ohio St.3d 103, 2006-Ohio-6510, 858 N.E.2d 368.

was experienced with the law generally or the criminal-justice system specifically. They had never before retained an attorney. As characterized by the board, Anthony and his family were vulnerable and were "unsophisticated, working class people" who had to borrow the $15,000 flat-fee retainer from Mr. Bell's employer to continue Summers's representation. The board found that after Summers was paid, "there was simply no more money to be had for legal fees and other defense costs. Respondent knowingly left Tony Bell destitute * * *." Summers left his client without representation and then added the insult of charging his client for the time spent preparing to withdraw from representation.

{¶ 40} When confronted with the fact that the fee agreement violated Ohio law, Summers refused to admit any wrongdoing. Instead, he averred that when meeting with the client and his family, he was simply confused and mistakenly accessed a flat-fee agreement that is authorized under the laws of Kentucky, where he also practices. Summers begrudgingly admitted that the agreement violated Prof.Cond.R. 1.5(d)(3) but maintained that his error was a mere oversight. He persists in this position even when confronted with the language of the agreement, which repeatedly referred to Ohio law rather than Kentucky law.

{¶ 41} In short, rather than accepting any responsibility in this matter, Summers has blamed his clients and others. The record amply demonstrates that he has been condescending to disciplinary counsel, that he only grudgingly cooperated with the disciplinary process, that he has shown "an attitude of righteous indignation," and that his testimony was laced with "lies and evasiveness." On these points alone, the cases in which we decided to stay the suspensions of those who have previously appeared before us are clearly distinguishable.

{¶ 42} In *Dayton Bar Assn. v. Schram*, 98 Ohio St.3d 512, 2003-Ohio-2063, 787 N.E.2d 1184, we publicly reprimanded the respondent for charging an

illegal fee in violation of former DR 2-106(A) and for failing to promptly pay client funds the client was entitled to receive in violation of former DR 9-102(B)(4). In that case, however, the respondent did not act with indignation and evasiveness in the disciplinary process. To the contrary, she cooperated with the relator, agreed to participate in a fee-arbitration program, and after her client declined to participate in that program, made full reimbursement to her client approximately nine months before the deadline set for doing so. *Id.* at ¶ 5. And there was no suggestion that she had been disrespectful to her client, abandoned him without counsel, acted with a selfish or dishonest motive, or refused to acknowledge her wrongful conduct. In light of those circumstances, the relator and the respondent entered a discipline-by-consent agreement, which this court adopted.

{¶ 43} In *Columbus Bar Assn. v. Mills*, 109 Ohio St.3d 245, 2006-Ohio-2290, 846 N.E.2d 1253, we again confronted a lawyer who charged an excessive fee and committed other violations of the disciplinary rules. But she, like the respondent in *Schram*, fully cooperated with the process and promptly remedied at least some of the billing errors she had made. *Id*. at ¶ 10, 18. In those circumstances, we adopted the parties' stipulations and agreed sanction, which included a one-year stayed suspension, the appointment of an attorney to monitor the respondent's practice, and participation in a fee-dispute program. *Id*. at ¶ 21.

{¶ 44} Two justices disagreed with the sanction imposed in *Mills*. The dissenting judges believed that rather than forcing the respondent's client to arbitrate the fee issue, the court should have ordered repayment. "We have already found that respondent collected an excessive fee. Why should we require [the client] to obtain new counsel and go through further legal hassles to collect an overcharged fee? We should conclude this matter now." *Id*. at ¶ 23 (Stratton, J., dissenting). So, too, in this case.

**{¶ 45}** The Bells have suffered enough. The board has determined that Summers violated Ohio law, charged an excessive and illegal fee, and fabricated mistruths about his clients. And he has shown disdain for the disciplinary process.

**{¶ 46}** Having considered Summers's misconduct and weighed the aggravating and mitigating factors as well as the sanctions imposed in comparable cases, we conclude that a six-month suspension and repayment of the $15,000 to the Bell family are the appropriate sanctions for the misconduct in this case.

**{¶ 47}** In rendering our decision, we note that in *Disciplinary Counsel v. Jackson*, 127 Ohio St.3d 250, 2010-Ohio-5709, 938 N.E.2d 1021, we were presented with an attorney who had charged an excessive fee, refused to refund the unearned amount, and was dishonest during the disciplinary investigation, among other violations. We emphasized the fact that although the respondent had offered limited cooperation in the disciplinary proceedings, his continued misconduct throughout the investigation and panel hearing outweighed his cooperation. *Id.* at ¶ 26. We imposed a two-year suspension of his license, and stayed only six months of that suspension. *Id.* at ¶ 2. Similar, continued misconduct is present in this case. Although the underlying charges in this case are not as severe as those in *Jackson*, Summers's continued misconduct throughout the disciplinary proceedings is a significant aggravating factor that must be weighed heavily.

**{¶ 48}** In *Disciplinary Counsel v. Johnson*, 113 Ohio St.3d 344, 2007-Ohio-2074, 865 N.E.2d 873, the attorney charged excessive fees to his elderly and vulnerable clients. We found that by "exploiting his incompetent wards * * * [the attorney] lessened public confidence in the legal profession and compromised its integrity." *Id.* at ¶ 88. We imposed a one-year suspension of the attorney's license to practice law, with the last six months of the suspension stayed. *Johnson* is instructive here because Summers similarly exploited a vulnerable client. The Bells had no experience with the criminal-justice system, were not from

Cleveland, and had limited financial means to pay large retainers. In addition, Anthony suffers from an anxiety disorder. Summers nevertheless charged the Bells a clearly excessive fee and then treated them in such a manner that they felt he regarded them as "low life."

{¶ 49} In light of the misconduct and aggravating and mitigating factors in this case, William Lawrence Summers is suspended from the practice of law in Ohio for six months. Any application for reinstatement must include proof that Summers has made restitution of $15,000 to the Bell family. Costs are taxed to Summers.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, LANZINGER, CUPP, and McGEE BROWN, JJ., concur.

O'DONNELL, J., dissents.

———————————

**O'DONNELL, J., dissenting.**

{¶ 50} I respectfully dissent from the majority's finding that Summers's conduct warrants an actual suspension from the practice of law in Ohio.

{¶ 51} In accord with the board's recommendation, the majority has ordered that Summers serve an actual six-month suspension from the practice of law and that he be required to return the entire $15,000 fee to the Bells. In determining the appropriate sanction for attorney misconduct, we have explained that " 'the primary purpose of disciplinary sanctions is not to punish the offender, but to protect the public.' " *Disciplinary Counsel v. Fumich*, 116 Ohio St.3d 257, 2007-Ohio-6040, 878 N.E.2d 6, ¶ 17, quoting *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53.

{¶ 52} I offer no excuses for Summers's conduct, which arose out of a fee dispute, but in sanctioning that conduct, I would accord greater weight to Summers's long and distinguished career. He has submitted letters from 6 current

and former judges from Ohio municipal (Judge Connally), common pleas (Judges Burnside and Sutula), and appellate (Judge Rogers) courts, the Kentucky Supreme Court (Justice Keller), and the United States District Court for the Northern District of Ohio (Judge Lambros), from 30 attorneys, and from 13 lay people who attest to his integrity, his high moral values, and his excellent reputation in the legal community. They speak of his strong commitment to the legal profession, his participation in a number of professional organizations, and his pro bono work, as well as his hard work and dedication to his clients.

{¶ 53} Based upon these attestations and the facts in this case, I conclude that Summers's conduct is an isolated incident in an otherwise unblemished 42-year legal career. In my view, an actual suspension from the practice of law is unnecessary to protect the public from future harm, but rather is excessive and punitive in light of the mitigating factors in this case. Therefore, I would impose a six-month suspension, all stayed, on the conditions that Summers commit no further misconduct and submit to fee arbitration to determine the amount of refund, if any, owed to the Bell family.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Joseph M. Caligiuri, Assistant Disciplinary Counsel, for relator.

Wiles, Boyle, Burkholder & Bringardner Co., L.P.A., Michael L. Close, and Dale D. Cook, for respondent.

_____