**KENTUCKY BAR ASSOCIATION, Movant**

v.

**William L. SUMMERS, Respondent.**

**No. 2012–SC–000254–KB.**

Supreme Court of Kentucky.

Oct. 25, 2012.

## OPINION AND ORDER IMPOSING RECIPROCAL DISCIPLINE

Respondent, William L. Summers, whose last known bar roster address is 5910 Landerbrook Drive, Suite 200, Mayfield Heights, Ohio 44124, and whose KBA Member No. is 82365, was admitted to the practice of law in the Commonwealth of Kentucky in 1988. Since 1969, he has also been licensed to practice law in Ohio, but he was recently suspended from practice in that state for six months. The Kentucky Bar Association through its Office of Bar Counsel moved this Court to require Respondent to show cause why identical reciprocal discipline against him should not be imposed in Kentucky under SCR 3.435. The Respondent has now filed his response to the show-cause order.

## I. Background

On March 22, 2012, the Supreme Court of Ohio suspended Respondent from the practice of law in Ohio for six months. *See Disciplinary Counsel v. Summers*, 131 Ohio St.3d 467, 967 N.E.2d 183 (2012). The court's opinion adopted the findings of fact and misconduct of the Ohio Board of Commissioners on Grievances and Discipline. Respondent's misconduct related to a $15,000 fee charged in, and early withdrawal from, a criminal assault case in which he represented Anthony Bell. The Respondent was alleged to have "(1) charged a clearly excessive fee, (2) failed to advise his client in writing that if he failed to complete the representation, the client might be entitled to a refund of all or part of the fee, (3) failed to promptly refund the unearned portion of his fee at the time of his withdrawal from the representation, and (4) engaged in conduct that adversely reflects upon his fitness to practice law." *Id.* at 184.

Because the Ohio Supreme Court's order is treated as "establish[ing] conclusively" the facts and misconduct for our purposes, SCR 3.435(4)(c), this Court adopts that court's factual discussion. The Ohio Supreme Court described the facts and misconduct at length as follows:

... [T]he client, Anthony Bell, was 19 years old when he was charged with multiple felony offenses for allegedly assaulting a police officer during a brawl in the stands at a professional baseball game between the Cleveland Indians and New York Yankees. Anthony, a resident of upstate New York who had no criminal record, insisted he was innocent. . . .

Anthony and his family knew no one in Cleveland. Acting on the referral of a bondsman, and with his family's financial support, Anthony retained Summers to defend him. From the beginning of the representation, Anthony and his family never equivocated in expressing what they wanted from respondent: exoneration of the charges.

Summers's first fee agreement with the Bell family was executed around the time of Anthony's arraignment in late April 2008. At the initial meeting, Sum-

mers secured an advance of $1,000 for expenses and a retainer of $2,500 from the family. And "to do a favor for them, to be kind to them," Summers agreed to reduce his hourly charge from $350 per hour to $250 per hour. Nonetheless, when Anthony's family received Summers's first invoice shortly after July 1, 2008, they discovered that Summers had charged them $350 per hour, the initial $2,500 retainer had been exhausted, they owed Summers an additional $2,500, and they were being charged for work performed by Summers's associate, Aaron Baker, at the rate of $125 per hour.

Baker evidently had worked for respondent for years but had only been licensed to practice law for several months when respondent assigned him to this case. Summers avers that Baker's time was normally billed at $175 per hour but that Summers had also reduced Baker's rate for this case.

Upon the Bells' inquiry, Baker acknowledged the $100 per-hour billing discrepancy and assured them that the bill would be corrected. Rather than adjust the bill himself, Baker asked Anthony's mother to pay the corrected amount. The Bell family never received an invoice with the correct billing rate and did not pay the erroneous invoice. Summers continued to represent Anthony for the next two months without a word about the nonpayment.

Less than one week before a pretrial hearing set for September 9, 2008, however, Summers informed Anthony that he was in breach of the fee agreement and threatened to withdraw from his representation unless a new fee agreement was secured. In doing so, Summers did not focus on the billing issue or nonpayment of fees as a reason for the alleged breach. Rather, Summers chastised Anthony's parents for their "interference" with his representation and stated that "there was something standing in the way of him completing the case."[1]

Anthony testified that he was scared out of his mind by Summers's threat to withdraw. His parents were worried about retaining new counsel; they did not think that they could afford to pay new counsel in addition to paying Summers's fee. The Bells therefore agreed to a new fee agreement—a flat-fee arrangement—with Summers.

The flat-fee agreement specified that Anthony and his family would pay $15,000 to Summers "in addition to any and all amounts already paid."[2] The agreement provided that $15,000 was all that Anthony would owe, regardless of the time that Summers would spend on his behalf, including work through the investigation "and, if necessary, through the trial, and if necessary, sentencing, or other disposition of the case."

In the fee agreement, Summers characterized the $15,000 fee as nonrefundable and, despite the requirements of Prof.Cond.R. 1.5(d)(3), did not advise the client and his family that they might be entitled to a refund of all or part of the fee if he failed to complete representa-

---

1. At the time, Summers was in conflict with a private investigator he had retained to assist in Anthony's case. He believed that the investigator had performed unauthorized work in the case, made derogatory or negative statements to the Bells about him, and tried to refer Anthony and his parents to another attorney to represent them in the case.

2. When the Bells questioned the initial bill sent by Summers, Baker's response stated, "Our retainer on a case like this would typically be $15,000. Because of your circumstances, we agreed to a heavily reduced retainer of $2,500, and agreed to bill you for our time as we went along. This arrangement was based upon anticipated prompt payment."

tion. In fact, although Summers initially insisted that he had read each word of the retainer to Anthony and his parents and explained each paragraph to them, he later admitted that he had not read to them the paragraph about the fee not being refundable. And when Anthony's mother subsequently sent an e-mail to Summers asking reasonable questions about the flat-fee retainer and what it meant, Summers responded with an e-mail that was, at best, impatient and intemperate, and at worst, scathing. In that e-mail, he also stated that the $15,000 flat fee "will cover all of the Attorney fees for the matter to the end, regardless of what time we have to spend which is *a benefit to you*. If you discharge us, you will however owe us for all of our time spent thus far, less the initial retainer. You will also owe us for bringing the new Lawyer up to speed." (Underlining sic.)

Four months after extracting the flat-fee agreement, Summers's representation abruptly ended. After collecting $17,726.01 in fees, Summers called Anthony in December and told him that "things weren't looking good, and he was going to try to work out a plea." The following month, Summers screamed at Anthony's father that he was "done" and "finished." After nine months of representing Anthony, Summers refused to continue the representation and then moved to withdraw, without securing a plea agreement for his client or otherwise finishing representation.

The board found by clear and convincing evidence that Summers violated Prof.Cond.R. 1.5(d)(3) (prohibiting a lawyer from charging a flat fee without simultaneously advising the client in writing that the client may be entitled to a refund of all or part of the fee if the lawyer does not complete the representation). We expressly reject Summers's protestations that his failure to include the language was an honest mistake that arose from his use of a form document intended for use in Kentucky, where, he argues, such notification is not required.

The board also found that Summers violated Prof.Cond.R. 1.5(a) (prohibiting a lawyer from making an agreement for, charging, or collecting an illegal or clearly excessive fee), 1.16(e) (requiring a lawyer to promptly refund any unearned fee upon the lawyer's withdrawal from employment), and 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law). The board challenged Summers's claim, and the testimony of two experienced criminal-defense attorneys, that he was entitled to the entire $15,000 fee based upon the hours he had spent on the case multiplied by his then hourly rate of $400. Prof.Cond.R. 1.5(a) lists a number of factors that must be considered in determining whether a fee is reasonable.[3] In

---

3. Factors to be considered under Prof. Cond.R. 1.5(a) include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

determining that the fee was clearly excessive, the board noted that Summers had not interviewed any witnesses, the prosecutor had yet to turn over his responses to a discovery request, no motions to suppress had been filed, no trial date had been set, and Summers had failed to complete the representation that he had agreed to see through to trial or sentencing. Moreover, the board found that Summers had fabricated reasons for withdrawing from representing Anthony, claiming that he and his parents were difficult to work with and had unrealistic expectations about his prospects for exoneration, as well as accusing them of attempting to suborn perjury.

Summers objects to the board's findings of fact and misconduct, arguing that the method he used to calculate his fee was appropriate, that relator could not prove that his fee was clearly excessive in the absence of expert testimony, that he substantially complied with the requirements of Prof.Cond.R. 1.5(d)(3) by providing an itemized bill to justify his retention of the entire flat fee, and that because there is insufficient evidence to prove that his fee is clearly excessive, there is also insufficient evidence to support a finding that he violated Prof. Cond.R. 8.4(h).2.

Having carefully reviewed the record, we conclude that these objections are without merit. Although the time spent and the experience, reputation, and ability of the lawyer providing the services are factors to be considered in determining whether a fee is reasonable, they are not the only factors relevant to that determination. Indeed, the rule identifies both the results obtained and the nature of the fee, be it fixed or contingent, as relevant considerations. Prof. Cond.R. 1.5(a)(4) and (8).3.

When a lawyer agrees to represent a client through the conclusion of the case for a flat fee, and that lawyer withdraws from representation without cause before the work is completed, he cannot retain the entire flat fee by resorting to a mathematical calculation of his billable hours. To hold otherwise would leave clients at the mercy of lawyers who charge significant flat fees to provide complete representation only to withdraw when the demands of the case become too onerous. While we recognize that Summers is entitled to be compensated for the services he has provided, the Bells are also entitled to receive a benefit for their flat-fee bargain.

Notwithstanding Summers's insistence that he kept "copious" billing records, his invoices to the Bells had numerous errors, and his billing was excessive for the amount of work completed. And, he violated Ohio law with an illegal nonrefundable flat-fee agreement.

And as the board concluded, "Respondent took great pains during the hearing to portray the Bells as difficult people whose conduct made continued involvement with them impossible. However, the panel simply does not believe Respondent's allegations and concludes that his complaints regarding the Bells' conduct are nothing more than a fabrication designed to convince the panel that he had an acceptable basis for his eventual discharge of the Bells as clients." Summers asserted several reasons for withdrawing.

First, he claimed that his investigator had taken the Bells to see another lawyer "to try and get him to take over the case."

Second, Summers asserted that there were "several instances of situations where [the Bells] were just incredibly unreasonable. And they started to have times where they were not telling the

truth, so it was a whole package that already started in August * * *." But when asked, under oath, what the Bells had lied about, Summers responded, "I don't remember." Summers did complain that Anthony had lied about his cell phone not working.

Third, Summers claimed that he would answer Anthony's questions about his defense only to be subsequently questioned by his parents about what he had said to Anthony. He intimated that the Bells were interfering with his representation by second-guessing his decision-making. The record does not support those contentions.

The Bells, who wanted their "son to have the best counsel possible" in a serious criminal case in which he faced incarceration, admit that initially they asked many questions of Summers in an effort to understand what was happening. But after receiving the first invoice that showed minimum quarter-hour billing for responding to even brief e-mails, the Bells insist that they ceased almost all communication with Summers. As Mrs. Bell testified, when the family saw the charges they were incurring for communications, "pretty much all communications stopped from there. We barely talked."

Even after executing the flat-fee agreement, the Bells had nothing but incidental communication with Summers and "no meaningful discussions, communications, [or] correspondence of any kind."

Anthony observed that Summers "did not take kindly to a simple question" from his mother, and thereafter Anthony asked few questions himself. He knew that it "became very expensive to communicate with [Summers], especially through e-mails." And Anthony was afraid to even take the time to read the flat-fee agreement because "we didn't

want to take too much of his time, to save money."

Mrs. Bell also testified about Summers's demeanor, describing how he "blew up" and exploded when she asked about the efforts to secure a video and video expert and how her husband was subjected to a "one-sided screaming fiasco by Mr. Summers" when Summers called to announce he was done with the case. That call reduced her husband to tears and forced him to plead with Summers, "Don't do this to my son. Please don't do this. I'm begging of you, don't do this." As Mrs. Bell said, "[W]e were treated * * * like low life."

The fact that the Bell family asked questions of Summers did not make them obstructionist, difficult, or contemptuous. Moreover, Summers knew, or should have known, that the Bells would ask questions of him. Summers met the Bell family at the outset of representation and included them as signatories in the retainer. He knew that this family was committed to obtaining justice for their son but were inexperienced with the legal system. Indeed, he promised them that their calls would be returned promptly, and he had no trouble depositing the checks they wrote to him for thousands of dollars in fees, even while he complained that they were "interfering" with the representation that those checks paid for by simply asking questions about the progress (or lack thereof) in the defense of their son.

Finally, Summers suggested that his withdrawal was necessary because of the Bells' unethical conduct in asking him "to commit perjury on the stand." The specific context of that claim is not clear given the cryptic testimony Summers provided on that point, but Summers intimated that the Bells had identified a witness who would testify falsely about the incident at the ball game in an effort

to exonerate Anthony. The Bells, however, denied any knowledge of that witness.

The board's finding that Summers's contentions had no merit is amply supported by the record. Summers failed to establish that the Bells interfered with his representation or that the Bells monopolized his time with questions, acted dishonestly, or otherwise acted inappropriately. Certainly, there is no support in this record for the scandalous claim that the Bells were suborning perjury. The board found that Summers terminated representation of Bell "without justifiable cause."

The affronts to the Bells and the profession did not stop with Summers's withdrawal from representation. After withdrawing, Summers submitted a final invoice to Anthony and his family. That invoice showed that an additional $2,586.49 was due. Billing records support the board's conclusion that Baker, not Summers, did much of the work on this case. And Summers had the temerity not only to charge Anthony and his family $1,425 for preparing the motion to withdraw as Anthony's counsel, but to then charge them for Summers's work on his (Summers's) complaint to a state agency claiming that the private investigator he hired had acted unethically in her relationship with the Bells.

Having carefully considered the record before us, we conclude that Summers's objections are without merit and therefore adopt the findings of fact and misconduct of the board.

*Id.* at 184–89 (footnotes and most brackets in original, paragraph markers omitted).

The court then turned to the appropriate sanction in light of Respondent's misconduct. In deciding the appropriate level of discipline, the Ohio Supreme Court considered the ethical duties of the attorney and the sanctions imposed in similar cases.

*Id.* at 189. The court also weighed aggravating and mitigating factors. *Id.* The aggravating factors were that "Summers acted with a dishonest and selfish motive, cooperated only grudgingly in the disciplinary process with an air of righteous indignation, was evasive and lied during his testimony at the panel hearing, refused to acknowledge the wrongful nature of his conduct, harmed vulnerable clients, and failed to make restitution." The mitigating factors "include[d] Summers's 41 years of practice without prior discipline and his good character and reputation apart from the underlying disciplinary offense, as demonstrated by approximately 50 letters from attorneys, judges, family members, and others." *Id.*

In response to Respondent's claim that the recommended sanction—six month's suspension and restitution of the $15,000 fee—was excessive absent expert testimony about the reasonableness of the fee, the court noted:

As Summers knew, Anthony suffered from a social-anxiety disorder, and he and his family were very troubled by the charges against him, which carried with them the specter of imprisonment. Neither he nor his family was experienced with the law generally or the criminal-justice system specifically. They had never before retained an attorney. As characterized by the board, Anthony and his family were vulnerable and were "unsophisticated, working class people" who had to borrow the $15,000 flat-fee retainer from Mr. Bell's employer to continue Summers's representation. The board found that after Summers was paid, "there was simply no more money to be had for legal fees and other defense costs. Respondent knowingly left Tony Bell destitute * * *." Summers left his client without representation and then added the insult of charging his client for the time

spent preparing to withdraw from representation.

When confronted with the fact that the fee agreement violated Ohio law, Summers refused to admit any wrongdoing. Instead, he averred that when meeting with the client and his family, he was simply confused and mistakenly accessed a flat-fee agreement that is authorized under the laws of Kentucky, where he also practices. Summers begrudgingly admitted that the agreement violated Prof.Cond.R. 1.5(d)(3) but maintained that his error was a mere oversight. He persists in this position even when confronted with the language of the agreement, which repeatedly referenced Ohio law rather than Kentucky law.

In short, rather than accepting any responsibility in this matter, Summers has blamed his clients and others. The record amply demonstrates that he has been condescending to disciplinary counsel, that he only grudgingly cooperated with the disciplinary process, that he has shown "an attitude of righteous indignation," and that his testimony was laced with "lies and evasiveness." On these points alone, the cases in which we decided to stay the suspensions of those who have previously appeared before us are clearly distinguishable.

*Id.* at 190.

The court then compared the Respondent's case to similar disciplinary cases, and concluded that "[t]he Bells have suffered enough." *Id.* at 191. The court then adopted the recommended sanction and ordered that the Respondent be suspended from the practice of law in Ohio for six months and that he repay the $15,000 to the Bell family. *Id.* In reaching that decision, the court emphasized that the Respondent had engaged in continued misconduct through the disciplinary proceedings, which is considered to be "a significant aggravating factor that must be weighed heavily." *Id.*

One justice dissented from the decision. That justice noted that there was "no excuse for Summers's conduct," but would "accord greater weight to Summers's long and distinguished career," which until that point was unblemished. *Id.* at 192. The justice noted that the primary purpose of the disciplinary process was not to punish but to protect the public. Thus, instead of a suspension and restitution, the dissenting justice would have stayed the suspension and required the Respondent to submit to fee-arbitration to determine what, if any, refund was due to the Bells. *Id.*

In April 2012, one month after the Ohio Supreme Court's decision, the KBA petitioned this Court to issue an order requiring Respondent to show cause why identical reciprocal discipline should not be imposed in this state under SCR 3.435. A show cause order was issued in June 2012. Respondent has now filed a response, so the issue of what, if any, discipline to impose is now ripe for review by this Court.

## II. Analysis

Under Kentucky Supreme Court Rule 3.435(4), Respondent shall be subject to identical discipline in the Commonwealth of Kentucky "unless [he] proves by substantial evidence: (a) a lack of jurisdiction or fraud in the out-of-state disciplinary proceeding, or (b) that the misconduct established warrants substantially different discipline in this State." SCR 3.435(4)(a)–(b). The Ohio Supreme Court's order, as a "final adjudication in another jurisdiction that an attorney has been guilty of misconduct[,] shall establish conclusively the misconduct for purposes of a disciplinary proceeding in this State." SCR 3.435(4)(c).

In his response, the Respondent admits that "he is well aware, understands and

respects that this ... Court must impose a reciprocal discipline." Nevertheless, he argues, no actual suspension should be imposed in Kentucky and instead he should receive only a stayed or probated suspension for the short time that remains on his Ohio suspension.[4] He claims that the exhibits attached to his response—which consist of his bill to the Bells, his extensive resume, and the 49 letters of reference from judges, attorneys, and lay people that were submitted in his Ohio case—demonstrate why this is so. He also argues that his billing records demonstrate that at his hourly rate, his services consumed the entire $15,000 retainer and thus he "properly refused to refund any fees paid by Anthony Bell and his family." He also claims that his actions were in conformity with both Ohio and Kentucky law, and that the disciplinary counsel relied on authorities from other states. He asks this Court to show leniency, in part because he has numerous cases in federal courts, where his admission is based on his Kentucky license, and it would be very costly for him to withdraw from those cases. He notes that he has complied with every disciplinary order issued in his Ohio case and is in the process of selling assets "to live and finalize all of the financial sanctions imposed upon him."

He admits that he appeared argumentative with the Ohio disciplinary panel but that he meant no disrespect. Upon learning that he had been perceived as disrespectful, he claims, he "set out to better himself by continuing to attend AA meetings and by seeing a counselor." In response to the aggravating factors found by the Ohio Supreme Court, which included lying during his testimony and dishonesty, he responds simply that "[t]his case was nothing but fee arbitration," which he sug-

gested doing several times. He claims the only thing wrong with the bill he sent to the Bells was that it was not stamped "paid in full," which is a reference to that fact that the fee arrangement was for a flat fee. He also points to the dissent as the proper way to resolve his case, given the purpose of the disciplinary process.

He closes his response with an emphasis on his more–than–40–year career, during which the "public has not now, nor ever has had to be protected from" him. He draws attention to the letters from judges, attorneys, and lay people, which he notes show that he has "given his life to the practice [of law]."

Most of the Respondent's discussion focuses primarily on why the Ohio Supreme Court should have decided his disciplinary case differently. That, however, is not grounds for not imposing identical reciprocal discipline. As noted above, the factual findings and the finding of a violation of ethical rules is binding on this Court. SCR 3.435(4)(c). An attorney may avoid identical reciprocal discipline only in two circumstances: (1) if the attorney shows a lack of jurisdiction or fraud in the out-of-state disciplinary proceeding, or (2) if the attorney shows that the misconduct established warrants substantially different discipline in this State. SCR 3.435(4)(a)–(b).

The Respondent has failed to show either scenario. There is no suggestion in any of the documents filed with this Court that the Ohio Supreme Court lacked jurisdiction or that fraud was involved. The second scenario can arise in numerous scenarios; under this exception, different discipline would be called for if, for example, Kentucky has historically punished the type of misconduct involved differently or

---

4. Actually, by the time this decision can be rendered, the Respondent's Ohio suspension will likely be completed.

if the act was misconduct in another state but not in Kentucky.

The Respondent does not cite any instances where this Court has been more lenient in sanctioning misconduct like that found by the Ohio Supreme Court. A review of some of our cases suggests that a six-month sanction is not out of line. Most reported cases involving excessive fees involve additional misconduct and have warranted greater discipline. For example, in *Veal v. Kentucky Bar Ass'n,* 867 S.W.2d 190 (Ky.1993), the attorney was found to have charged an excessive fee and had acted in such a way as to reflect adversely on his honesty, trustworthiness, or fitness as a lawyer, which is similar to what happened in this case. That attorney, however, was disbarred, because he also misappropriated client funds and engaged in criminal acts. Other cases with similar elements of misconduct have imposed lesser sanctions, but those cases involved less overall misconduct. For example, in *Kentucky Bar Association v. Earhart,* 360 S.W.3d 241 (Ky.2012), a reciprocal discipline case, the attorney was suspended only for 30 days, but he was alleged only to have failed to have returned an unearned flat-fee after the client committed suicide before any work could be done. None of the aggravating circumstances and additional misconduct present in this case appeared in *Earhart.*

The Respondent's behavior falls somewhere between these types of cases, which suggests that the six-month suspension is not inappropriate.

Moreover, the Respondent does not argue extensively that his behavior does not violate the Kentucky Rules of Professional Conduct, as opposed to Ohio's rules, though his response does include the passing claim that what he did was legal in Kentucky. Admittedly, Kentucky's ethics rules superficially appear to deal with flat-

fee or "classic" retainer cases differently than Ohio does. Ohio expressly disallows a fee denominated as "earned upon receipt," "nonrefundable," or in any similar terms, unless the client is simultaneously advised in writing that if the lawyer does not complete the representation for any reason, the client may be entitled to a refund of all or part of the fee based upon the value of the representation pursuant to division (a) of this rule.

Ohio Prof. Cond. R. 1.5(d)(3).

Kentucky's rules do not address such fees expressly. However, the KBA's Ethics Committee has issued a formal opinion which substantially adopts the approach in Ohio's rule. *See* KBA Ethics Opinion E–380 (June 1995). In that opinion, the committee concluded that such arrangements were permissible but that "[t]he fee arrangement must be fully explained to the client, orally, *and in a written agreement* that is signed by the client." *Id.* (emphasis in original). Any such fee must also be reasonable as required generally by SCR 3.130(1.5). Thus, the law in Kentucky on the subject of non-refundable retainers appears to be the same as in Ohio. *See also Earhart,* 360 S.W.3d at 244 (citing Ethics Opinion E–380 with approval).

Ultimately, this Court concludes that the Respondent has not shown cause why identical reciprocal discipline should not be imposed. The Ohio Supreme Court has already weighed the Respondent's misconduct against his mitigating evidence and found that a substantial suspension was still called for. The Respondent's previously unblemished record and admirable career, while impressive, simply are not grounds at this point to deviate from the discipline imposed in Ohio. The Ohio Supreme Court found that the Respondent violated multiple ethical rules, was abusive to his client and the client's family, and was dishonest in the course of the disci-

plinary process. This Court concludes that the Respondent has failed to demonstrate grounds that would allow imposition of a different sanction under SCR 3.435.

## ORDER

Seeing no reason why Respondent should not be subjected to identical discipline in this state, SCR 3.435, it is hereby ORDERED that:

1. The Kentucky Bar Association's petition for reciprocal discipline is GRANTED. Respondent, William L. Summers, is suspended from the practice of law in the Commonwealth of Kentucky for 180 days.

2. Under SCR 3.390(2), within ten days after the issuance of this order the Respondent shall notify, by letter duly placed with the United States Postal Service, all courts or other tribunals in which that lawyer has matters pending, and all clients of the lawyer's inability to represent them and of the necessity and urgency of promptly retaining new counsel. Respondent shall simultaneously provide a copy of all such letters of notification to the Office of Bar Counsel. Respondent shall immediately cancel any pending advertisements, to the extent possible, and shall terminate any advertising activity for the duration of the term of suspension.

3. In accordance with SCR 3.450, Respondent is directed to pay any costs associated with these disciplinary proceedings against him, should there be any, and execution for such costs may issue from this Court upon finality of this Opinion and Order.

All sitting. All concur.

ENTERED: October 25, 2012.

/s/ <u>John D. Minton</u>